UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BRYIANT C. OVERTON, | |
| Petitioner, | Case No. 3:19-cv-00003 |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| STATE OF TENNESSEE, | |
| Respondent. | |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

**REPORT AND RECOMMENDATION**

In 2009, a Tennessee jury convicted Petitioner Bryiant C. Overton of attempted first-degree murder, aggravated robbery, kidnapping, and conspiracy to commit kidnapping. (Doc. No. 28-1.) He is currently serving an effective sentence of forty-eight years in the custody of the Tennessee Department of Correction. *Overton v. State*, No. M2016–00783–CCA–R3–PC, 2018 WL 287176 (Tenn. Crim. App. Jan. 4, 2018).

Before the Court is Overton's amended petition for a writ of habeas corpus under 28 U.S.C. § 2254, in which Overton asserts that his confinement violates his Sixth Amendment right to effective assistance of counsel. (Doc. No. 16.) The Court referred this action to the Magistrate Judge to recommend disposition of Overton's petition. (Doc. No. 12.) Having considered the parties' arguments and the underlying record under the exacting standards of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the Magistrate Judge will recommend that the Court deny Overton's amended petition.

# I.     Background

## A.     Factual Background

The Tennessee Court of Criminal Appeals (TCCA) provided the following summary of the

evidence presented during Overton's trial:

> This case arises from events that occurred on December 15, 2007, when the victim
> was taken to a ditch and shot multiple times. Based on these events, a Rutherford
> County grand jury indicted [Overton] for conspiracy to commit kidnapping,
> especially aggravated kidnapping, especially aggravated robbery, and attempted
> first degree murder. The following evidence was presented at [Overton]'s trial:
> Darice Brown, the victim in this case, testified that on December 15, 2007, she had
> a conversation with one of the co-defendants, Robert Adams ("P.T."), who was
> seeking to purchase cocaine. The victim said that P.T. asked the victim to "call
> somebody for him," so she called "B.I.," a man she knew supplied cocaine. The
> victim said that she had "been around" B.I. before, but had never purchased drugs
> from him. The victim arranged a meeting with B.I. at Wal–Mart at 7:30 p.m., and
> B.I. instructed her to come alone because he "didn't deal with men."
>
> The victim testified that [Overton]and his three co-defendants, P.T., Kesha Adams
> ("Cash"), and Kristie Ray ("Michelle") picked the victim up at her house. The
> victim recalled that Michelle was driving, Cash was in the passenger seat, and the
> victim was seated in the back between [Overton] and P.T. When they arrived at
> Wal–Mart the victim exited the vehicle and [Overton] and P.T. followed her but
> remained outside of the Wal–Mart while the victim went inside and spoke with B.I.
> B.I. asked the victim who the two men were, and the victim told B.I. the men's
> identities. B.I. said, "[N]ever mind," indicating he would not proceed with the drug
> transaction, so the victim returned to the car and informed the others. P.T.
> instructed the victim to try again and, this time, to take Cash with her. The victim called B.I.
> and arranged to meet B.I. at his car with Cash, while P.T. and [Overton] remained
> in Michelle's car. P.T. gave Cash the money to purchase the cocaine and Cash
> completed the exchange with B.I.
>
> The victim testified that, upon returning to the car, [Overton] said, in reference to
> B.I., "I know that n[*]gger. I had a beef with him last summer." [Overton] asked
> the victim if she knew where B.I. lived and asked P.T. to give him a gun. P.T.
> passed [Overton] the gun across where the victim was seated in the car. The
> victim testified that, up until this gun was produced, she was unaware of a weapon in the
> car. [Overton] then instructed the victim to call B.I. and to show them where B.I.
> lived. The victim agreed to call B.I. but told [Overton] she did not know where B.I.
> lived, but [Overton] did not believe her. Michelle pulled over and waited, while the
> victim attempted to call B.I. with no success. The victim said she then called her
> cousin and asked where B.I. lived. Her cousin responded by asking whether the
> victim was in trouble, and [Overton] instructed the victim to disconnect the phone
> call so she complied. Michelle indicated that she knew where B.I. lived and began

driving, but [Overton] told her to stop and take the ramp to "get back on the interstate."

The victim testified that, once they were on the ramp, P.T. stuck his finger in the cocaine, tasted it, and said it "wasn't real." P.T. then passed the cocaine to Cash who also tasted it and agreed that the cocaine "wasn't real." The victim recalled that the situation then escalated with [Overton] insisting that she knew where B.I. lived. The victim testified that she did not feel free to leave and that P.T. had told the victim that she "wasn't going anywhere unless he got his money or [his] drugs." The victim asked [Overton] if "this [was] about money" and offered to help recover his money. Cash said "put the bitch out and make her walk or we could tie her up." The victim, who had been pushing "send" on her phone in hopes of someone overhearing the conversation, reached for her phone that was between her legs, and [Overton] "snatched the phone" from her. The victim said that she was fearful and relinquished her cell phone because [Overton] "had a gun and he wanted it."

The victim testified that [Overton] instructed Michelle where to drive, leading the group to a remote location. During the drive, Cash continued to suggest to P.T. things they could do to the victim. The victim recalled that [Overton] told the victim that she "thought [she] was too good for him." and that P.T. told her that "somebody was going to die tonight." [Overton] finally told Michelle to stop the car in an unlit location. [Overton] opened the car door, took the victim's purse, and then pulled the victim out of the car with her back facing him. The victim recalled feeling the first gunshot to her leg and hitting the ground. The victim was facing Michelle's car and could see [Overton]'s feet but nothing else. The victim testified, "I felt the first one and I held my mouth because I didn't want [Overton] to hear me scream. And I just waited for it to hit my head. I waited to die. I thought [Overton] was going to kill me." The victim said that she heard "a lot" of shots until the gun "clicked" indicating there were no more bullets. [Overton] then instructed Michelle to "go," a car door shut, and the four co-defendants drove away.

The victim explained she could not call for help because [Overton] drove away with her cell phone. The victim recounted what occurred after the shooting:

> I laid there because it was warm and I couldn't move my leg. I just laid there and I prayed. And I guess I had laid there so long that the temperature had dropped and it started to mist. And [it] got to where I could slide. So I took my elbows and stuck them in the mud and pulled myself until I got to the highway.

The victim explained that she could not walk because her femur was shattered from the gun shots. The victim said that she pulled herself into the middle of the road and laid there hoping someone would find her. A car finally did stop, and the victim asked its occupants to call her family. An ambulance arrived and took the victim to Middle Tennessee Medical Center where she was stabilized. She later was air-lifted to Vanderbilt Hospital and treated in the trauma unit.

3

The victim testified that, when she woke up in the hospital, she had a colostomy bag, a rod in her left leg, liver damage, a fractured pelvis, four bullets in her body and her elbows were damaged. The victim said that she could not initially speak because she was "breathing through a tube." The victim said that she wore the colostomy bag for six months until doctors were able to reconnect her intestines after she sustained injuries to her rectum. The victim testified that she has had "no less than seven" surgeries related to the injuries resulting from this shooting. The victim acknowledged that she used a cane in court that day as a result of the injuries from the shooting.

The victim testified that, while inside Michelle's car, she did not feel she had any control over what happened, explaining, "Once the gun came out, I felt trapped." Likewise, she said that when [Overton] took her phone she did not feel she had any choice but to relinquish it because he had a gun.

The victim testified that, while at Vanderbilt hospital, detectives showed her photographic line-ups, and she positively identified [Overton] and the three co[-]defendants.

The victim acknowledged that she had two prior felony convictions, explaining that she was with "someone" who sold drugs to an informant. As a result, she was charged and convicted of conspiracy to sell drugs for being present during the drug sale.

On cross-examination, the victim testified that she did not intend to use any of the halfounce of cocaine Cash purchased from B.I. for $450. The victim said that, at the location where she was shot, she could see a house in the distance, but it was so dark she "couldn't see [her] hand in front of [her] face." The victim recalled that [Overton] immediately shot her upon her exit from the vehicle and that, as she was lying on the ground, she saw [Overton]'s white Nike Air Force One shoes. [Overton] got back into the car, and instructed Michelle to drive away.

Stevie Trotter testified that as her husband Ryan Trotter was driving herself, Phillips, and Michael Glossop home from a Christmas party, the group saw a woman in the road as they drove down Beasley Road. Trotter's husband stopped the car and went with Glossop to try to speak with the victim. Trotter said she was able to communicate with the victim although the victim's voice was "faint." The victim told Trotter her name, said someone she knew had shot her, and said "something about drugs."

Ryan Trotter testified that he saw the victim lying in the street as he drove down Beasley Road. He parked his car and approached the victim, initially unable to tell she was shot, and asked why she was in the road. The victim indicated that she had been shot. Ryan asked the victim, multiple times, who shot her, but the victim's responses were difficult to understand. Ryan said, "[T]he only thing I could make out was like D or Debo." Upon being asked, Ryan said that he had never seen [Overton] before and did not know his name or nickname.

4

David Hailey, a Rutherford County Sheriff's Department lieutenant, testified that, when he arrived at the scene, emergency responders were loading the victim into the ambulance. Based upon the seriousness of her injuries and his concern that she might not survive the injuries, Lieutenant Hailey got into the ambulance and spoke with the victim before the ambulance transported her to the hospital. Lieutenant Hailey said it was difficult to understand the victim, but he "got down real close to her face." The victim repeatedly told Lieutenant Hailey that Debo shot her. The Lieutenant, thinking the victim was trying to say something else, asked her repeatedly for the name of the shooter and the victim repeated Debo. The victim also provided the names of three other individuals: Cash, P.T., and Michelle. Lieutenant Hailey said that he "stayed out of the scene" to preserve the evidence but that he saw a purse lying in the road and what appeared to be marks left from the victim dragging her body across the road.

Duane Jackson, a Rutherford County Sheriff's Department detective, testified that, later on the day of the shooting, he interviewed the victim at Vanderbilt hospital. The victim was unable to talk at that time, but she wrote down the answers to the detective's questions. When he asked the victim who shot her, she responded by writing "Debo." The victim further indicated that fake drugs were sold during a drug transaction and that Debo was upset due to her involvement in the drug transaction. The detective showed the victim a photographic lineup that included [Overton]'s photograph. The victim indicated that [Overton] was the shooter and showed no hesitation in identifying him.

Dr. Richard Miller testified that he treated the victim upon her admission to Vanderbilt hospital trauma unit and continued to treat the victim at the time of the trial. Dr. Miller testified that the victim sustained multiple gunshot wounds, which caused major liver damage, a fractured femur bone, and a hole in the victim's rectum. All of these injuries required major operative intervention and were "life threatening injuries."

James Martin, a Rutherford County Sheriff's Department deputy, testified that he recovered shell casings and a white purse at the crime scene. At a later point, Deputy Martin collected from Middle Tennessee Medical Center the victim's blood-stained clothing, which contained bullet holes.

Based upon this evidence, the jury convicted [Overton] of conspiracy to commit kidnapping, aggravated kidnapping, aggravated robbery, and attempted first-degree murder. The trial court ordered [Overton] to serve an effective sentence of sixty years in the Tennessee Department of Correction.

*State v. Overton*, No. M2009–01977–CCA–R3CD, 2011 WL 538857, at *1–4 (Tenn. Crim. App. Feb. 15, 2011).

## B. Procedural History

### 1. State Trial Proceedings

A Rutherford County, Tennessee, grand jury indicted Overton for conspiracy to commit kidnapping, especially aggravated kidnapping, especially aggravated robbery, and attempted first degree murder. (Doc. No. 28-1.) The General Sessions Court for Rutherford County held a preliminary hearing in Overton's case. *See Overton v. State*, 2018 WL 287176, at *1–2. Overton appeared, represented by attorney R. Wilford Fraley, III, and the State offered testimony from the victim. *See id.*

The charges against Overton proceeded to a trial on March 24 and 25, 2009, in the Sixteenth Judicial District Circuit Court for Rutherford County. (Doc. No. 28-3–28-4.) Fraley represented Overton. (*Id.*) Following the two-day trial, the jury convicted Overton of conspiracy to commit kidnapping, especially aggravated kidnapping, aggravated robbery, and attempted first-degree murder. (Doc. No. 28-5.) At sentencing, the trial court ordered Overton "to serve an effective sentence of sixty years in the Tennessee Department of Correction." *State v. Overton*, 2011 WL 538857, at *4. Overton filed a motion for a new trial, arguing that the trial court should set aside the jury's guilty verdicts because the evidence was insufficient to support his convictions. (Doc. No. 28-1.) He also moved for a judgment of acquittal. (*Id.*) The trial court held a hearing on Overton's motions and denied them in a written order signed on September 17, 2009. (*Id.*)

Overton appealed to the TCCA with Fraley's assistance, arguing that there was insufficient evidence to support his convictions. (Doc. No. 28-10.) The State opposed Overton's sufficiency arguments on appeal (Doc. No. 28-11), but the State also drew the TCCA's attention to an inconsistency in Overton's robbery conviction, judgment, and sentence. While the jury convicted Overton "of the lesser-included offense of aggravated robbery, a Class B felony[,]" "the trial court incorrectly entered a judgment of conviction against [him] for especially aggravated robbery, a

6

Class A felony, and sentenced him for this felony." *State v. Overton*, 2011 WL 538857, at *8. The TCCA rejected Overton's sufficiency arguments and affirmed his convictions, but remanded the case for the trial court to amend the judgment of conviction and resentence Overton for the correct robbery offense. *Id.* at *9. Overton did not seek review by the Tennessee Supreme Court.

The trial court resentenced Overton on the aggravated robbery count and ordered him to serve an effective sentence of forty-eight years for all of his convictions. *See Overton v. State*, 2018 WL 287176, at *1.

### 2.    State Post-Conviction Proceedings

Overton filed a pro se petition for post-conviction relief in the Circuit Court for Rutherford County on February 2, 2012. (Doc. No. 28-15.) He filed an amended petition with the assistance of appointed counsel on September 1, 2015, arguing that his convictions were unconstitutional because he received ineffective assistance of counsel at trial and on direct appeal. (*Id.*) Specifically, Overton argued that Fraley's representation was ineffective because Fraley:

a) "failed to obtain the General Sessions [p]reliminary [h]earing transcript to be used to impeach the State's primary witness and surviving victim at trial" (*id.* at PageID# 997, ¶ 15.a);

b) "failed to object to the shell casings being presented to the [j]ury although the casings were never deemed admissible at a [p]re-[t]rial [e]videntiary [h]earing" and "failed to request or subject this physical evidence to scientific testing prior to trial to determine if there was a fingerprint pattern inconsistent with [Overton's]" (*id.* at PageID# 998, ¶ 15.b);

c) "failed to file a [b]ill of [p]articulars as requested by [Overton] prior to trial to fully inform [Overton] of the charges and consequences he faced" (*id.* at ¶ 15.c);

d) "conceded [Overton's] guilt . . . to the [j]ury during closing arguments and the [m]otion for [j]udgment of [a]cquittal" (*id.* at ¶ 15.d);

e) "failed to submit a written notice of mitigating factors for the trial court's consideration at sentencing to negate or limit the enhancement factors submitted by the State and in turn to negate or limit the consecutive sentencing factors considered and imposed by the [t]rial [c]ourt" (*id.* at PageID# 999, ¶ 15.e);

7

f) "failed to challenge the consecutive sentencing on appeal as requested by [Overton]" (*id.* at ¶ 15.f);

g) "failed to submit jury instructions to determine whether the victim's removal or confinement pertaining to the [e]specially [a]ggravated [k]idnapping charge was incidental to the accompanying felony offenses and not a separate act in and of itself" (*id.* at ¶ 15.g);

h) "failed to contradict the State's proof and raise reasonable doubt wherein Detective Downing testified at trial that the victim's purse was recovered at the crime scene and that no cell phone was ever recovered" which "proof was a decisive factor regarding his [a]ggravated [r]obbery conviction . . . " and "failed to cast reasonable doubt to the jury based upon the fact that the cell phone of the victim could have very well been burned in the suspects' vehicle prior to ever being discovered" (*id.* at PageID#999–1000, ¶ 15.h);

i) "failed to assert that the Rutherford County Sheriff's Department allowed evidence to be destroyed, tampered with, or fabricated evidence that was to be utilized and examined at trial to exonerate [Overton]" (*id.* at PageID# 1000, ¶ 15.i);

j) "failed to object to comments that [Overton] believes to be false made by the State and State's witnesses during trial and that counsel failed to utilize the preliminary hearing CD and the discovery obtained by the defense to impeach the State's witnesses" (*id.* at ¶ 15.j);

k) "failed to object during the State's closing arguments regarding key evidence and the personal opinion of the State as to the truth of State witnesses and guilt of [Overton] to inflame the passions of the jury, and called for the jury to do justice by convicting [Overton]" (*id.* at ¶ 15.k);

l) "failed to object to the line of questioning and evidence presented by the State supporting the character traits of the victim without it being at issue or the door opened through some action or questioning by the defense" (*id.* at PageID# 1000–1001, ¶ 15.l);

m) "failed to utilize the material differences and variances between the allegations in the original indictment and the superceding indictment coupled with the proof presented at trial to challenge the State's case[,]" "failed to move the Court to strike the testimony that was contradictory[,] and failed to move for an acquittal based upon the material variances" (*id.* at PageID# 1001, ¶ 15.m); and

n) "was ineffective and detrimental to [Overton]'s cause by providing information [Overton] would submit was misleading to the Tennessee Court of Appeals during [Overton]'s direct appeal" (*id.* at ¶ 15.n).

Overton also argued that the State engaged in prosecutorial misconduct and that the trial court committed additional errors. (Doc. No. 28-15.)

The post-conviction court held an evidentiary hearing regarding Overton's amended petition on February 19, 2016. (Doc. No. 28-14.) Overton and Fraley testified, as did several other witnesses. (*Id.*)

The TCCA summarized Overton's and Fraley's testimony at the post-conviction evidentiary hearing as follows:

> At the post-conviction hearing, [Overton] testified that, at his request, [Fraley] filed a motion to obtain the preliminary hearing transcript, that the [trial] court granted the motion, and that counsel later withdrew the motion without [Overton]'s consent. [Overton] said he wanted the transcript for [Fraley]'s use in cross-examining the victim but that this did not occur. When asked repeatedly if [Overton] knew that portions of the preliminary hearing audio recording were inaudible, his responses did not address the question asked. He denied that he had wanted a new preliminary hearing and stated that someone other than his attorney had requested a new hearing. He agreed that his attorney had "dismissed or had the Judge take that off the docket that there was no legal basis for a second preliminary hearing." [Overton] maintained, however, that [Fraley] had withdrawn a request for a transcript of the preliminary hearing.
>
> [Overton] testified that the victim's trial testimony had been inconsistent with her preliminary hearing testimony in several respects. He said the victim testified at the preliminary hearing that the drug transaction involved about $400 but that she did not remember the quantity of the drugs, whereas at the trial, she stated that the transaction was for one-half ounce of cocaine for $400. [Overton] stated that the victim testified at the preliminary hearing that when "we" left Walmart, "we went straight" to the location of the drug transaction, whereas at the trial, she stated that "we" drove around for an extended period of time. [Overton] explained that this point was relevant to the kidnapping charge because the victim stated she had been held against her will in the car and that [Overton] had a gun. [Overton] stated that the victim claimed during the trial not to know "where B.I. lived," not to know B.I., and not to be familiar with Murfreesboro, but that she testified at the preliminary hearing to knowing and to having been to the exact location of B.I.'s home in Murfreesboro. [Overton] stated that although the victim testified at the preliminary hearing that she did not remember hearing the words, "[L]et the bitch out or make her walk," she testified at the trial that Kesha Adams made this statement. [Overton] stated that at the preliminary hearing, the victim positively identified him as the shooter but that at the trial, she testified that it was so dark she could not see her hand and that although she did not see who shot her, she knew it was [Overton].

[Overton] testified that the victim's recorded pretrial statement to the police contained inconsistencies with her preliminary hearing testimony, as well. [Overton] stated that the victim testified at the preliminary hearing that either he or codefendant Robert Adams had said, "[S]omeone is going to die tonight," and that the victim initially claimed not to know who said it but later identified [Overton] as the speaker. [Overton] said, however, that in the victim's pretrial statement, she had identified Mr. Adams as the speaker. [Overton] stated that the victim said in her pretrial statement that the gun was not passed to him and that the cell phone was not taken from the victim until the car reached the scene of the shooting. He said that the victim testified at the trial, however, that [Overton] had the gun and gave orders as they drove around before reaching the scene.

When asked if his attorney advised [Overton] that the law was "against" him relative to a jury instruction regarding the kidnapping charge, [Overton] did not answer whether [Fraley] advised him in this regard. Instead, [Overton] made a non-responsive statement about *State v. Cecil*, 409 S.W.3d 599 (2013), applying to cases in the appellate process at the time of the *Cecil* ruling.

[Fraley] testified that he attempted to obtain the preliminary hearing transcript. He said the trial court granted a motion to have the hearing transcribed but that the tapes were "untranscribable." He later agreed that the recording had been inaudible. He said that counsel for a codefendant filed a motion to have the case remanded to general sessions court for a new preliminary hearing and that the motion was denied. [Fraley] said that although [Overton] wanted him to file an identical motion, he declined to do so based upon the court's rejection of the codefendant's motion. [Fraley] said he would have "loved" to have had the transcript. He said, however, that he did not think the transcript would have been beneficial because he made detailed notes at the preliminary hearing. He noted that the victim testified both at the preliminary hearing and at the trial that she saw [Overton] shoot her seven times. A transcript of a pretrial motions hearing was received as an exhibit. It reflects the history of the efforts to obtain the preliminary hearing transcript. The trial court noted that efforts had been made to transcribe the recording but that the court reporter had been unable to hear it. The prosecutor clarified that although the officers could be heard on the recording, some of the victim's statements were inaudible. [Fraley] agreed with the prosecutor's characterization of the recording.

[Fraley] testified that his practice was to review proposed jury instructions with a client, and although he thought he reviewed them with [Overton], he was unsure. [Fraley] thought that the State provided jury instructions for him to review and that he had not seen any issues with them.

[Fraley] testified that he felt prepared for the trial and that he and [Overton] discussed [Overton]'s version of events. [Fraley] said he and [Overton] discussed the fact that the three codefendants identified [Overton] as the shooter. [Fraley] said that he and [Overton] discussed [Overton]'s right to testify and that [Overton] waived the right. [Fraley] said that he and [Overton] had a communication breakdown at one point. He could not recall whether he filed a motion to withdraw

or whether [Overton] filed a motion to have him removed as counsel, but he said the trial court denied the motion. [Fraley] later said they "both made the similar request." [Fraley] said that [Overton] had been unable to articulate any deficiency in [Fraley]'s representation when the court held a hearing on the motion. [Fraley] said [Overton] declined the settlement offers that [Fraley] conveyed. [Fraley] said that he wrote out for [Overton] the terms of a twenty-year plea offer received on the first day of the trial, that [Overton] rejected the offer, and that [Overton] did not want to sign anything regarding his rejection.

[Fraley] testified that the facts developed at the trial were in keeping with his expectations and that his strategy was to attempt to lessen [Overton]'s responsibility and to shift the blame to others. [Fraley] thought, based upon the verdict, he had been successful. [Fraley] was uncertain whether he discussed the appellate issues with [Overton] before filing the brief. [Fraley] said he raised only those issues in the motion for a new trial and the appeal which he thought were significant.

*Overton v. State*, 2018 WL 287176 at *1–3.

The post-conviction court denied Overton's amended petition on March 31, 2016. (Doc. No. 28-15.) Overton filed a pro se appeal to the TCCA, arguing that the post-conviction court erred in denying his ineffective-assistance-of-counsel claims, that post-conviction counsel was ineffective, and that the State asked him inappropriate questions during the post-conviction evidentiary hearing. (Doc. Nos. 28-22, 28-24.)

The TCCA affirmed the post-conviction court's denial of Overton's amended petition in a written decision issued on January 4, 2018. *Overton v. State*, 2018 WL 287176, at *4–7. Overton wrote a pro se application for permission to appeal the TCCA's decision to the Tennessee Supreme Court and "handed it off to 'mailroom authorities' at his prison on February 28, 2018." (Doc. No. 48, PageID# 1520.) This Court explained in denying the State's motion to dismiss that "[w]hat happened next is unclear":

It appears the prison mailroom sent the [ ] Application to the Clerk of the Appellate Courts ("Clerk"). (See Doc. No. 42 at 4). The Clerk marked the application as "received" on March 12, 2018. (Id.). Next, the Clerk apparently filed the [ ] Application on the docket but labeled it as "correspondence" as opposed to as a party filing. https://www.tncourts.gov/PublicCaseHistory/CaseDetails.aspx?id=66628&Party=True (all websites last visited Mar[.] 4, 2022). In fact, the [ ] Application is not viewable in the online version of the state court docket like other

filings, id.; it is only available in the physical version of the docket (see Doc. No. 42). Although Mr. Overton appears to believe someone rejected the [ ] Application as untimely, it is not clear what that belief is based upon. (See Doc. No. 38-1 at 56–60). Neither the parties' filings in this Court nor the docket for Mr. Overton's state court proceedings contain any decision from the [Tennessee Supreme Court] (or even the Clerk, for that matter) concerning Mr. Overton's [ ] Application.

(*Id.* (footnotes omitted).)

### 3.    Federal Post-Conviction Proceedings

Overton initiated this action by filing a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1.) He subsequently retained counsel who filed an amended petition on his behalf that "adopts and incorporates [ ] [Overton's] original [p]etition" without alteration. (Doc. No. 16, PageID# 69, ¶ 1.) Overton's amended petition asserts that his confinement is unconstitutional under the Sixth Amendment because he received ineffective assistance of counsel at trial. (Doc. No. 16.) Specifically, Overton argues that Fraley was ineffective because he: (1) "fail[ed] to retrieve a copy of the preliminary hearing transcript [that] was critical in the defense's ability to impeach the victim's testimony at trial"; (2) incriminated [Overton] when he asserted at closing argument that [Overton] possessed a gun that was passed to him by a co-defendant"; and (3) stated during closing argument that Overton was "a drug addict" and that Fraley was "not [there] to get Bryiant Overton off." (*Id.* at PageID# 77.)

The State filed the state-court record (Doc. No. 28–28-6) and moved to dismiss Overton's amended petition as untimely (Doc. No. 31). The Court denied the State's motion to dismiss (Doc. No. 48), and the State answered Overton's amended petition (Doc. No. 49). The State argues that Overton is not entitled to relief on his claim regarding Fraley's failure to obtain the preliminary hearing transcript because Overton has not shown that Fraley's representation was ineffective, has not shown any resulting prejudice, and has not satisfied AEDPA's stringent requirements for this claim. (*Id.*) The State further argues that Overton procedurally defaulted his claims regarding

Fraley's closing-argument statements by failing to exhaust his state-court remedies and that Overton has not shown the required cause and prejudice to excuse those defaults. (*Id.*)

Overton filed a reply arguing that Fraley's failure to obtain the preliminary hearing transcript or file a motion to remand for a new preliminary hearing was deficient and prejudicial. (Doc. No. 53.) He further argues that any failure to exhaust his state-court remedies regarding Fraley's closing-argument statements "should be excused in as much as it is a part of the overall deficient performance of his state trial counsel." (*Id.* at PageID#1571.)

## II.     Legal Standard

Overton's amended petition is governed by 28 U.S.C. § 2254(d), as amended by AEDPA. Section 2254(d) provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

Under § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law only "if the state court applies a rule different from the governing law set forth in" the Supreme Court's holdings "or if it decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v.*

13

*Taylor*, 529 U.S. 362, 405–06 (2000)). A state court's "decision is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case[.]" *White v. Woodall*, 572 U.S. 415, 426 (2014). To be actionable under § 2254(d)(1), a state court's unreasonable application of Supreme Court precedent "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). Instead, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), habeas relief is available if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The statute provides that a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)).

AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S.

14

65, 66 (2011) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)). The AEDPA "standard is difficult to meet . . . because it was meant to be." *Harrington*, 562 U.S. at 102; *see also Burt*, 571 U.S. at 20; *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle "that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)); *see also Woods*, 575 U.S. at 316.

AEDPA also imposes a "total exhaustion requirement," providing that "'[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State'" with respect to each claim, or such remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (second and third alterations in original) (quoting 28 U.S.C. § 2254(b)(1)(A)); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."). This "exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). AEDPA therefore requires a petitioner to "properly present[] his or her claims through one 'complete round of the State's established appellate review process.'" *Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (quoting *id.* at 845). A petitioner incarcerated in Tennessee exhausts all available state remedies under AEDPA once the TCCA denies a claim of error. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39 (exhaustion of remedies)).

"Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). Under the doctrine of procedural default, a petitioner who may no longer present claims in state court because he or she failed to meet state procedural requirements must "demonstrate cause for his [or her] state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). The one exception to this doctrine "is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that [the federal habeas court's] failure to review his [or her] federal claim will result in a fundamental miscarriage of justice." *Id.*

## III.     Analysis

All of Overton's claims in this action invoke his Sixth Amendment right to counsel. (Doc. No. 16.) The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court held in *Strickland v. Washington* that "the right to counsel is the right to the effective assistance of counsel." 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)); *see also id.* at 685 ("An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."). A claim that counsel did not provide effective assistance "has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

Deficient performance under *Strickland* is "measured against an 'objective standard of reasonableness' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380

(2005) (quoting *Strickland*, 466 U.S. at 687, 688); *see also Wiggins*, 539 U.S. at 521 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (alteration omitted) (quoting *Strickland*, 466 U.S. at 688)). "[I]n applying *Strickland* [ ] , hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' [ ] decisions are made and by giving a 'heavy measure of deference to counsel's judgments[.]'" *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689, 691). To establish prejudice under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 390 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

Under AEDPA, a federal court's evaluation of an ineffective-assistance-of-counsel claim that was decided on its merits in state court is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The court must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" *Id.* (first quoting *Strickland*, 466 U.S. at 689; and then quoting *Knowles*, 566 U.S. at 121 n.2)). In other words, the court must "give[ ] both the state court and the defense attorney the benefit of the doubt." *Burt*, 571 U.S. at 15. Viewed through AEDPA's "'deferential lens'" *Cullen*, 563 U.S. at 190 (quoting *Knowles*, 566 U.S. at 121 n.2), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" *Harrington*, 562 U.S. at 105.

## A.     Ineffective Assistance of Counsel: Failure to Obtain Hearing Transcript

Overton's primary argument in support of his amended petition is that Fraley was ineffective for failing to obtain the preliminary hearing transcript or to move for remand for a new preliminary hearing. (Doc. Nos. 16, 53.) The State concedes that Overton exhausted his state-court remedies with respect to this claim. (Doc. No. 49.)

In analyzing this ineffective-assistance-of-counsel claim, the TCCA discussed *Strickland*'s deferential standard and considered whether a preponderance of the evidence in the record contradicted the post-conviction court's factual findings and whether the post-conviction court's factual findings supported its legal conclusions:

### Ineffective Assistance of Counsel

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368–72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley* [*v. State*], 960 S.W.2d [572,] 580 [(Tenn. 1997)]. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . ., are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A. <u>Issues Related to Impeachment of the Victim</u>

[Overton] raises several issues related to ineffective assistance of counsel in the impeachment of the victim. He contends that the post-conviction court erred in denying relief on his claim that trial counsel provided ineffective assistance by failing to obtain the preliminary hearing transcript for use in impeaching the victim with her prior testimony. He also contends that the court erred in denying relief on his claim that counsel failed to provide effective assistance in cross-examining the victim with her prior statement to police investigators. For the first time on appeal, he contends that counsel provided ineffective assistance in failing to obtain the assistance of an audio enhancement specialist in order to recover the information on the recording of the preliminary hearing. The State contends that the post-conviction court did not err in determining that [Overton] failed to prove his claims related to the preliminary hearing transcript and impeachment of the victim and that the issue related to an audio enhancement specialist is waived. We agree with the State.

Trial counsel testified at the post-conviction hearing that the trial court granted his motion to obtain the preliminary hearing transcript but that the recording was not amenable to transcription because it was inaudible. He stated that counsel for a codefendant made a motion for the case to be remanded to general sessions court for a new preliminary hearing but that the trial court denied the motion. Trial counsel declined to make an identical motion on [Overton]'s behalf because he thought it would be futile, given the court's ruling on the codefendant's motion. Counsel said that although he would have "loved" to have had the transcript, it was unnecessary because he took detailed notes of the testimony at the preliminary hearing.

[Overton]'s complaints regarding failure to impeach the victim relate primarily to alleged deficiencies in cross-examining her regarding the point at which she felt she was not free to leave the car in which she rode with [Overton] and his codefendants. He claims that this was relevant to show whether a kidnapping offense existed separate from the other crimes of which he was convicted.

The post-conviction court found that trial counsel requested the preliminary hearing transcript but that no further action was required once the recording could not be transcribed due to poor audio quality. The court found that counsel aggressively cross-examined the victim at the trial using counsel's notes from the preliminary hearing. The post-conviction court found that the discovery material was available to [Overton] and his counsel and that [Overton] could have alerted his counsel to genuine conflicts. The court also found that the victim identified [Overton] as having held her against her will in the vehicle and as the person who shot her. The court found that counsel's examination of witnesses and his objections at the trial

showed his preparation and purpose. The court found that [Overton] failed to present clear and convincing evidence that counsel's performance was deficient and that [Overton] was prejudiced. Thus, the court concluded that [Overton] did not receive the ineffective assistance of counsel relative to counsel's efforts to obtain the preliminary hearing transcript and to impeach the victim.

Upon review, we conclude that the evidence does not preponderate against the post-conviction court's factual findings. We conclude, as well, that the court's legal conclusions are supported by the court's factual findings.

[Overton] also argues, for the first time on appeal, that trial counsel provided ineffective assistance by failing to have the preliminary hearing recording recovered by an audio enhancement specialist. He acknowledges in his reply brief that he did not raise this issue in the post-conviction court and states that he has raised it in this court "solely for the purpose of exhausting it for review when [Overton] reaches federal review, if that becomes necessary." [Overton] submitted a compact disc with his brief. He claims that the disc contains the recording of the preliminary hearing and that it can be understood, albeit with difficulty. The record reflects that the recording was not received as an exhibit at the post-conviction hearing. The evidence at the hearing established that the recording was inaudible and not amenable to transcription. To the extent that [Overton] contends otherwise and that counsel should have sought the assistance of an audio enhancement specialist in order to obtain a transcript, [Overton] should have presented evidence to support his claim at the hearing. Consideration of an issue which is raised for the first time on appeal is waived. *See, e.g.*, *State v. Turner*, 919 S.W.2d 346, 356–57 (Tenn. Crim. App. 1995); *see* T.C.A. § 16–5–108(a) (2009) (stating that the jurisdiction of the Court of Criminal Appeals is appellate in nature); T.R.A.P. 36(a) (stating that the appellate courts may not grant relief in contravention of the trier of fact).

[Overton] is not entitled to relief on his ineffective assistance of counsel claims related to obtaining the preliminary hearing transcript and impeaching the victim with her prior statement and testimony.

*Id.* at *3–5.

Overton argues that Fraley's failure to obtain the preliminary hearing testimony was deficient and prejudicial under *Strickland* (Doc. No. 53), but he has not acknowledged AEDPA's requirements or provided any argument or authority regarding whether the TCCA misapplied *Strickland* or based its decision on an unreasonable determination of the facts as required to obtain relief under § 2254(d). Presuming that the TCCA's factual findings are correct, as it must, the Court finds that there are reasonable arguments that Fraley satisfied the minimum standards for

representation set forth in *Strickland*. *See Harrington*, 562 U.S. at 105. Overton has not shown that he is entitled to relief under AEDPA for Fraley's failure to obtain the preliminary hearing transcript or move for remand for a new preliminary hearing.

### B.     Ineffective Assistance of Trial Counsel: Closing Argument Statements

Overton does not contest the State's assertion that he procedurally defaulted his remaining ineffective-assistance-of-counsel claims based on Fraley's statements to the jury during closing argument that a co-defendant passed Overton a gun, that Overton was a drug user, and that Fraley was not there to get Overton acquitted. He argues, however, "that any failure to include th[ese] argument[s] in his state claim should be excused in as much as it is a part of the overall deficient performance of his state trial counsel" and that his appointed post-conviction counsel "should have [ ] included" these claims in his amended petition for state post-conviction relief. (Doc. No. 53, PageID# 1571.)

Overton has not developed any argument or cited any legal authority to show that the Court may excuse his procedural default of these claims.[1] The Sixth Circuit has repeatedly explained that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." *United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016) (second alteration in original) (quoting *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009)). Accordingly, Overton has waived any argument that the Court may

---

[1]     For instance, Overton does not cite *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), in which the Supreme Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a [petitioner's] procedural default of a claim of ineffective assistance at trial." Nor does Overton respond to the State's arguments (Doc. No. 49) that *Martinez* does not provide a basis from which Overton can overcome the procedural default of his claims in this action.

excuse his procedural default of these claims. He therefore has not shown that he is entitled to relief under AEDPA.

**IV.      Recommendation**

For these reasons, the Magistrate Judge RECOMMENDS that Overton's amended petition for a writ of habeas corpus under 28 U.S.C. § 2554 (Doc. No. 16) be DENIED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 7th day of August, 2023.

ALISTAIR E. NEWBERN
United States Magistrate Judge

22